## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| WAITR HOLDINGS INC., *et al.*,[1] | ) | Case No. 24-10676 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Interim Hearing: May 22, 2024 at 1:00 p.m. ET (requested)** |
| | ) | |
| | ) | **Final Hearing / Sale Hearing: June 5, 2024 at 2:00 p.m. (ET)** |
| | ) | |
| | ) | **Objection Deadline: May 29, 2024 at 4:00 p.m. (ET)** |
| | ) | |

**TRUSTEE'S MOTION FOR ENTRY OF ORDERS: (I) APPROVING USE OF CASH COLLATERAL AND CARVE-OUT FOR BENEFIT OF THE ESTATES; (II) AUTHORIZING THE TRUSTEE TO RETAIN AND PAY CONSULTANTS; (III) APPROVING SALE OF PAYMENT PROCESSING BUSINESS ASSETS AND ASAP DOMAIN NAME FREE AND CLEAR OF INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**

Jeoffrey L. Burtch, as chapter 7 trustee (the "Trustee") for the estates of the above-captioned debtors (the "Debtors"), hereby moves (the "Motion") for entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Order"): (i) approving, on an interim basis, the Trustee's use of the Cash Collateral[2] of Luxor Capital Group, LP, in its capacity as Administrative Agent and Collateral Agent (in such capacity, "Luxor Capital") and a Carve-Out to pay administrative expenses, including those associated with the sale process; (ii) authorizing the Trustee to retain and compensate certain Consultants on an interim basis; and

---

[1] The Debtors in these cases are the following entities (the respective case number for each estate follows in parentheses): Waitr Holdings Inc. (24-10676-JTD) ("Waitr Holdings"), Waitr Intermediate Holding, LLC (24-10677-JTD) ("Waitr Intermediate Holdings"), Dude Delivery, LLC (24-10678-JTD) ("Dude Delivery"), Cape Payments LLC (24-10679-JTD) ("Cape Payments"), BiteSquad.com, LLC (24-10680-JTD) ("BiteSquad"), ASAP Inc. (24-10681-JTD) ("ASAP"), Have Fun, LLC (24-10682-JTD) ("Have Fun"), DDIT, LLC (24-10683-JTD), CDMX Holdings, LLC (24-10684-JTD), Delivery Logistics, LLC (24-10685-JTD), Catering on Demand LLC (24-10686-JTD) ("Catering On Demand"), and KASA Delivery, LLC ("KASA Delivery") (24-10687-JTD).

[2] All undefined terms shall carry the meanings set forth herein or in the APA, as applicable.

(iii) scheduling a hearing (the "Final Hearing" or "Sale Hearing") to consider entry of the Final Order (defined herein) as well as certain additional relief, addressed below.

The Trustee further requests that, at the Final Hearing, the Court: (1) enter an order, substantially in the form attached hereto as Exhibit B (the "Final Order"), approving the Trustee's use of Cash Collateral and the Carve-Out on a final basis; and (2) enter an order substantially in the form attached hereto as Exhibit C (the "First Sale Order") (a) approving and authorizing the sale (the "Payment Processing Business Sale") of the Payment Processing Business Assets to Luxor Capital or its designee pursuant to the terms of the *Asset Purchase Agreement*, dated May 10, 2024 attached hereto as Exhibit D (the "APA"), (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assumed Contracts") to Luxor Capital or its designee, and (c) granting related relief.

Finally, pursuant to the APA, the Trustee has agreed to sell the ASAP Domain Name (as defined herein) to Luxor Capital or its designee subject to an additional 90-day marketing period. The Trustee respectfully requests that the Court schedule an additional hearing (the "Second Sale Hearing") for the Court to consider higher and better bids received by the Trustee for the ASAP Domain Name, if any.  If no higher and better bid is received, the Trustee will request entry of an order, substantially in the form appended hereto as Exhibit E (the "Second Sale Order" and together with the First Sale Order, the "Sale Orders"), authorizing the sale of the ASAP Domain Name to Luxor Capital pursuant to the APA.

In support of this Motion, the Trustee respectfully states as follows:

## Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding

pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of this Court, the Trustee consents to the entry of a final order with respect to this Motion if it is determined that the Court lacks adjudicatory authority under Article III of the United States Constitution to enter such final order absent consent of the parties.

3.      The statutory predicates for this Motion include, without limitation, sections 105(a), 363(b), 363(c), 363(m), 365(b)(1), 365(f), and 704(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Background**

**A.  Overview**

4.      On April 2, 2024 ("Petition Date"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware ("Court") for relief under chapter 7 of the Bankruptcy Code, commencing the above-captioned bankruptcy cases (the "Bankruptcy Cases").

5.      On or about the Petition Date, the Office of the United States Trustee appointed the Trustee as the interim trustee to the Estates of the Debtors.  The section 341 meeting of creditors is scheduled for May 14, 2024.

6.      Prior to the Petition Date, the Debtors operated out of leased locations in Mobile, Alabama and Charlestown, Massachusetts, and maintained a headquarters at a leased office space located at 214 Jefferson Street, Lafayette, Louisiana.  The Debtors operated a number of discrete business lines in the consumer food service and payment processing industries.  ASAP

and Bitesquad developed an online ordering technology platform advertised as a "deliver anything ASAP" model, allowing consumers to order food, alcohol, groceries and other goods online through agreements with major restaurant chains and retailers.  Catering on Demand operated a similar business using the tradename Foodify, offering an online software that allowed businesses to cater food from local restaurants.

7.    In addition, Cape Payments provided payment processing services (the "<u>Payment Processing Business</u>") to various businesses ("<u>Merchants</u>").   Among other services, Cape Payments facilitated Merchants' access to credit card payment processors and provided point of sale terminal equipment and other electronic payment services.  Cape Payments, in turn, entered into referral agreements with certain credit card processors (the "<u>Referral Agreements</u>").  Under the Referral Agreements, Cape Payments agreed to solicit Merchants to enter into processing agreements with the processor in return for residual fees, bonuses and/or other compensation ("<u>Residual Fees</u>"), calculated on a monthly basis related to the amount and/or type of Merchants referred and/or as a percentage of the processor's collections from the Merchants that Cape Payments referred.

8.    The significant assets of the Estates include the Debtors' intellectual property, customer lists, certain domain names, including asap.com (the "<u>ASAP Domain Name</u>"), and various agreements, including the Referral Agreements.

**B. Luxor Capital's Prepetition Financing**

9.    ASAP, as borrower, and all of the other Debtors except Waitr Holdings, as guarantors, are parties to a *Credit and Guaranty Agreement,* dated as of November 15, 2018 (as amended or supplemented from time to time, the "<u>Credit Agreement</u>"), under which Luxor Capital serves as administrative agent for the lender parties thereto. Pursuant to the Credit

4

Agreement, the lenders agreed to extend a term loan to the Debtors in an aggregate principal amount of $25,000,000.  Additionally, Waitr Holdings, as borrower, is a party to a certain Credit Agreement (as amended or supplemented from time to time, the "<u>Convertible Notes Agreement</u>"), under which Luxor Capital serves as administrative agent for the lender parties thereto.  Pursuant to the Convertible Notes Agreement, the Lenders agreed to extend a term loan in an aggregate principal amount not to exceed $60,000,000 to Waitr Holdings.

10.     According to the Debtors' bankruptcy schedules, Luxor Capital holds a secured claim against all of the Estates except the Waitr Holdings Estate in the approximate amount of $13,337,189.34 ("<u>Luxor Secured Claim</u>") and an unsecured claim against the Waitr Holdings Estate in the approximate amount of $44,665,437.90 ("<u>Luxor Unsecured Claim</u>").  Luxor Capital asserts that the Luxor Secured Claim is secured by liens (any such liens, together, the "<u>Prepetition Liens</u>") against the assets of the Estates, excluding Waitr Holdings (collectively, the "<u>Prepetition Collateral</u>"), including, without limitation, Cash Collateral.

11.     Luxor Capital recorded financing statements against the assets of ASAP, Waitr Intermediate, Kasa Delivery, BiteSquad, Catering on Demand, CDMX and Delivery Logistics (collectively, the "<u>Delivery Assets</u>") during the 90-day period prior to the Petition Date.  No financing statement was recorded on the assets of Waitr Holdings (the "<u>Holdings Assets</u>," and together with the Delivery Assets, the "<u>ASAP Assets</u>").  The Trustee believes the lien on the Delivery Assets is avoidable under section 547 of the Bankruptcy Code and, further, that the Prepetition Liens do not encumber any of the Holdings Assets.

**C.  Proposed Sale**

12.     It is the Trustee's understanding that, in the months before the Petition Date, the Debtors were engaged in discussions with Luxor Capital about recapitalizing the companies, as

LEGAL\70534854\1

well as with an interested third party about a possible sale. These discussions did not lead to a transaction with either party, and the Debtors were forced to file these Bankruptcy Cases due to lack of liquidity.

13.     Almost immediately following the Trustee's appointment, Luxor Capital approached the Trustee with concerns about the Payment Processing Business. The Referral Agreements have significant value, generating Residual Fees of approximately $800,000 per month that are automatically deposited into Cape Payments' bank accounts. Whether the Estates continue to receive Residual Fees, however, is dependent on the Merchants remaining with the credit card processors referred by Cape Payments. The Trustee has learned that, shortly after the filing of the Bankruptcy Cases, third parties began to contact individual Merchants in an attempt to transfer their business to other processors. Additionally, it appears that one processor may have ceased paying Residual Fees as required under its Referral Agreement. These actions violate the automatic stay and the various agreements with the Debtors. Although the Trustee has begun efforts to enforce the Estates' rights and may be successful in litigation, the reality is that competitors may attempt to poach the Debtors' processors and Merchants. The Trustee is concerned that, absent expensive litigation, the Residual Fees may continue to decline unless and until the Payment Processing Business is sold to an operator that can manage the customers and accounts.

14.     Shortly after the Petition Date, Luxor Capital approached the Trustee with a proposal to purchase the Payment Processing Business Assets. After arm's length negotiations, the Trustee and Luxor Capital reached an agreement regarding the sale of the Payment Processing Business Assets and the ASAP Domain Name (each a "Sale," and together, the "Sales") and entered into the APA. Subject to Court approval, the Trustee has agreed to sell the

6

Payment Processing Business Assets to Luxor Capital (the "<u>Buyer</u>") in return for a credit bid (the "<u>Credit Bid</u>") of $5,000,000 of Luxor's Secured Claim, cash in the amount of $350,000, and the Cash Collateral Agreement. As fully described in the APA, the Payment Processing Business Assets include, *inter alia,* the Referral Agreements, certain accounts receivables related thereto, various Assumed Contracts and intellectual property rights relating to the business, books and records, and certain claims and causes of action relating to the business and the Assumed Contracts.

15.     In addition, the APA provides for the sale of the ASAP Domain Name to Luxor Capital for $300,000, subject to an additional 90-day marketing period by the Trustee. If no higher or better bid is received by the Trustee, the Trustee will request that the Court enter the Second Sale Order authorizing the sale of the ASAP Domain Name to Luxor Capital pursuant to the APA. If a higher and better bid is received, the Trustee will hold an auction and, at the Second Sale Hearing, request that the Court authorize the sale of the ASAP Domain Name to the highest and best bidder.

**D.  Terms of APA**

16.     The principal terms of the APA are summarized as follows:[3]

| Agreement Provision | Summary Description |
|---|---|
| Seller | Jeoffrey L. Burtch, the chapter 7 trustee of the Estates of the Debtors |
| Purchaser | Luxor Capital Group, LP, in its capacity as Administrative Agent, Collateral Agent and Lead Arranger under that certain Credit and Guaranty Agreement, dated as of November 15, 2018, or its designee ("<u>Buyer</u>"). |
| Purchase Price | The aggregate consideration for the sale and transfer of the Payment Processing Business Assets, including all Intellectual Property Rights related thereto, is $5,350,000, plus the use of Cash Collateral, as follows: (a) a credit bid (the "<u>Credit Bid</u>") of Buyer's secured debt in the amount of $5,000,000 (Five Million US Dollars); (b) a cash bid of $350,000 (Three Hundred Fifty Thousand US Dollars) (the "<u>Payment Processing Business Cash Consideration</u>"); and (c) the terms of an agreement between the Buyer and the Seller on the usage and carve-out of cash collateral (the "<u>Cash Collateral</u> |

[3] The following summaries of the APA are for the convenience of the reader. To the extent of any inconsistence between the summaries in this Motion and the terms of the APA, the APA will govern.

| Agreement Provision | Summary Description |
|---|---|
| | Agreement") (collectively, the "Payment Processing Business Consideration"). In addition, Buyer shall pay cash in the amount of $300,000 (Three Hundred Thousand US Dollars) for the ASAP Domain Name (the "ASAP Domain Name Consideration" and together with the Payment Processing Business Consideration, the "Purchase Price"), which amount shall be payable and deliverable in accordance with Section 3.3.<br><br>APA § 2.1. |
| Required Deposit | N/A. |
| Purchased Assets | The term "Acquired Assets" under the APA is defined as all of the Estates' right, title and interest of every kind and nature whatsoever of the Estates, including Intellectual Property Rights, in and to the assets of the Payment Processing Business Assets, including those specifically set forth on Schedule 1.1(a), and the ASAP Domain Name.<br><br>In summary, the Payment Processing Business Assets include certain accounts receivable and deposits, certain claims and causes of action, certain domain names, intellectual property, and Assumed Contracts.<br><br>*See* APA § 1.1, Sch. 1.1(a). |
| Excluded Assets | Any assets owned by the Estates which are not specifically identified above as being part of the Acquired Assets are deemed to be "Excluded Assets", specifically including, but not limited to (i) cash, other than as set forth herein and on Schedule 1.1(a) and in the Cash Collateral Agreement (as defined herein); (ii) deposits, other than as set forth on Schedule 1.1(a); (iii) accounts receivable, other than as set forth on Schedule 1.1(a) and accounts receivable subject to the Cash Collateral Agreement; (iv) insurance; (v) rights in insurance; (vi) other than as set forth on Schedule 1.1(a), all claims and causes of action against insiders and third parties, including but not limited to avoidance actions, under chapter 5 of the Bankruptcy Code and claims against the officers and directors of the Debtors; (vii) any and all other causes of action of the Estates except those identified on Schedule 1.1(a); and (viii) any books and records Seller deems necessary for the administration of the Bankruptcy Cases, provided, however, to the extent books and records subject to this subparagraph would fall under the description of Acquired Assets, the Buyer and Seller shall cooperate on the transfer and access to any books and records required for the administration of the Bankruptcy Cases until the Bankruptcy Cases are closed.<br><br>APA § 1.2. |
| Assumed Liabilities | At the Closing, Buyer shall assume, and Buyer shall pay, perform and, satisfy and discharge when due, all liabilities and obligations arising on or after the Closing Date in accordance with the respective terms, which relate to or arise from the Acquired Assets and Assumed Contracts, including the Cure Amounts (the "Assumed Liabilities"); provided, however, that, with the exception of the Cure Amounts (and the separate Cash Collateral Agreement which provides for, among other things, the use of Cash Collateral to pay administrative expenses accruing from the Petition Date through the Closing), Buyer shall have no liability whatsoever and shall not be deemed to have |

8

| Agreement Provision | Summary Description |
|---|---|
| | assumed any liabilities or obligations arising prior to the Closing Date and which relate to or arise from Acquired Assets and Assumed Contracts which shall, unless otherwise agreed by the parties and approved by the Bankruptcy Court, remain the responsibility of the Estates.<br><br>APA § 1.4. |
| Estate Representations, Warranties and Covenants | The Trustee represents and warrants that, subject to the entry of the Sale Order, he has all requisite power and authority to enter into the APA. The Trustee also covenants to permit reasonable access to information regarding the Payment Processing Business prior to Closing.<br><br>*See* APA § 4.1. |
| Break-Up Fee and Expense Reimbursement | N/A |
| Bidding Procedures Order | N/A |
| Closing Conditions | The Closing is conditioned upon the satisfaction of the conditions set forth in Article 7 of the APA or the waiver thereof by the party entitled to waive the applicable condition.<br><br>*See* APA §§ 7.1, 7.2 |
| Termination Events | The APA may be terminated by the Trustee and/or the Buyer, as applicable, upon the occurrence of the events described in Article 8 of the APA.<br><br>*See* APA § 8.1. |

17.     Pursuant to Local Rule 6004-1(b), the Trustee highlights the following terms, conditions and provisions of the APA:

a. **Sale to Insider**.  A Luxor Capital representative was a member of the Debtors' board of directors.

b. **Agreements with Management**.  The Trustee is not aware of any agreement between the Buyer and the Debtors' management or key employees regarding compensation or future employment.

c. **Releases**.  There are no claims being released as part of the APA.

d. **Competitive Bidding**.  The APA is subject to higher and better offers received for the Acquired Assets.  If the Trustee receives a higher and better offer for the Payment Processing Business Assets, he will conduct an auction prior to the Sale Hearing. With respect to the Domain Name, the APA provides for a 90-day marketing period.  The APA authorizes the Trustee to sell the Domain Name to the highest and best offer received for the ASAP Domain Name that is greater than $330,000.   (*See* APA § 1.5).

e. **Closing and Other Deadlines**.  Under the APA, the Closings shall take place within five (5) business days after entry of the respective Sale Orders.  The APA may be terminated by either Seller or Buyer if the Closing does not occur by June 15, 2024.  (*See* APA §§ 3.1, 8.1).

f. **Termination Rights**.  The APA may be terminated upon the occurrence of the following:

(a)      By either Seller or Buyer if the Closing shall not have occurred by June 15, 2024, due to no fault of either Party; provided, however, that such date may be extended by Seller and Buyer upon mutual agreement;

(b)      By either Seller or Buyer upon the entry of an order of the Bankruptcy Court authorizing the sale of the Acquired Assets in a Competing Transaction;

(c)      By Seller if Buyer shall have breached any of its obligations, representations, warranties, covenants or agreements contained in this Agreement, which breach cannot be or has not been cured within three (3) Business Days after the giving of written notice by Seller to Buyer specifying such breach;

(d)      By Buyer if Seller shall have breached any of its obligations, representations, warranties, covenants or agreements contained in this Agreement, which breach cannot be or has not been cured within three (3) Business Days after the giving of written notice by Buyer to Seller specifying such breach; or

(e)      By the mutual written consent of Seller and Buyer.

(APA § 8.1).

g. **Good Faith Deposit**.  N/A

h. **Interim Agreements with Proposed Buyer**.  The Buyer and the Trustee have agreed to the Cash Collateral Agreement, as discussed below.

i. **Use of Proceeds**.  By this Sale Motion, the Trustee does not propose to release sale proceeds on or after the closing without further Court order.

j. **Tax Exemption**.  The APA does not require the sale to be exempt from taxes under section 1146(a) of the Bankruptcy Code.

k. **Record Retention**. The APA does not require the Estates to retain records after Closing.

l. **Sale of Avoidance Actions**.  The Trustee does not seek to sell or otherwise limit the Estates' right to pursue avoidance actions under chapter 5 of the Bankruptcy Code.

m. **Sale Free and Clear of Unexpired Leases**.  The Trustee does not seek to sell property free and clear of a possessory leasehold interest, license or other right.

n. **Credit Bid**.  The APA includes a Credit Bid by the Buyer, as addressed above.

o. **Relief from Bankruptcy Rule 6004(h)**.  The Trustee requests that the Court waive the stay of Bankruptcy Rule 6004(h), as discussed further below.

LEGAL\70534854\1

**E.  Use of Cash Collateral and Carve-out**

18.     The Debtors' cash and other proceeds of the Debtors' existing accounts receivable and other collateral constitute part of the Prepetition Collateral (the "Cash Collateral") and, therefore, may not be used absent compliance with section 363(c)(2) of the Bankruptcy Code.  The Trustee has determined that, absent a carve-out from Luxor Capital, he would not have the resources to administer the Payment Processing Business Assets, and moreover, the Debtors' unsecured creditors would likely realize no benefit from such administration.  As an express condition to entering into the APA, the Trustee and Luxor Capital agreed to a carve-out pursuant to the cash collateral agreement (the "Cash Collateral Agreement") set out in paragraph 3 of form of the Interim Order, and paragraph 3 of the form of Final Order, accompanying this Motion.

19.     The principal terms of the Cash Collateral Agreement include the following:[4]

a.  The Trustee stipulates that:

  i.  As of the Petition Date, the outstanding principal amount owed under the Credit Agreement was $13,582,988.88 plus interest and allowable costs and expenses to the extent provided under the Credit Agreement and allowed under the Bankruptcy Code and applicable law, without regard to offsets, setoffs or counterclaims against the Lenders;

  ii.  The Prepetition Liens against the assets of the Estates of Cape Payments, Dude Delivery, DDIT and Have Fun (collectively, the "Cape Payments Assets") constitute valid, enforceable, duly perfected, first-priority liens (the "Cape Payments Liens") upon and security interests against the Cape Payments Assets; and

  iii.  The Cape Payments Liens are not voidable under the provisions of the Bankruptcy Code or applicable non-bankruptcy law.

---

[4] The terms of the Cash Collateral Agreement as set out in the Interim and Final Orders shall control to the extent that any conflict with this summary.

b.  Luxor Capital stipulates that:

    i.  Upon the Closing of the Sale of the Payment Processing Business, Luxor Capital waives, releases and discharges its Prepetition Liens against the ASAP Assets.

    ii.  Upon the Closing of the Sale of the Payment Processing Business to Luxor Capital (or its designee), Luxor Capital will pay the Payment Processing Business Consideration free and clear of Luxor Capital's claims, liens and interests, and the Prepetition Liens will not attach to such proceeds.

    iii.  Upon the Closing of the sale of the ASAP Domain Name, the proceeds of the sale will be free and clear of Luxor Capital's claims, liens and interests if Luxor Capital is the buyer.  If Luxor Capital is not the buyer, the Prepetition Liens will not attach to such proceeds, but Luxor Capital may share in such proceeds as a general unsecured creditor.

    iv.  Upon the Closing of the Sale of the Payment Processing Business to Luxor Capital (or its designee):

        1.  Luxor shall hold a claim in the amount of $8,582,988.88 secured by any remaining Cape Payments Assets that are not sold pursuant to the Sale (but not against the Payment Processing Business Consideration or the proceeds of the ASAP Domain Name) (the "Luxor Secured Claim"); and

        2.  Luxor shall hold a general unsecured claim in the amount of $8,582,988.88 against the Estates of ASAP, Waitr Intermediate, Kasa Delivery, BiteSquad, Catering on Demand, CDMX and Delivery Logistics, except that Luxor Capital shall not be entitled to share in any distribution of the Payment Processing Business Consideration (the "Luxor Unsecured Deficiency Claim").

        3.  Luxor may hold other unsecured claims in connection with the Convertible Notes Agreement (the "Luxor Unsecured Notes Claim").  All parties' rights are reserved with respect to the Luxor Unsecured Notes Claim.

c.  The Trustee is willing to conduct the Sale only if he can pay all costs of administering the Estates (including the expenses related to recovering, preserving, marketing and selling, or otherwise disposing of the Collateral) from Cash Collateral, and only if the Sale will provide some benefit to the Estates. Effective upon entry of this Order, Luxor Capital expressly consents and agrees to carve-out from the Prepetition Liens the following funds (the "Carve-Out"): (i) all funds currently on deposit in the Trustee's accounts for the Estates; (ii) all funds currently on deposit in the Debtors' deposit accounts, including without limitation those accounts at Bank of America and GFA Credit Union; and (iii) the March and April Residual Fees.  The Carve-Out shall be held by the Trustee free and

clear of any and all liens, claims, encumbrances and interests, including the Prepetition Liens asserted by Luxor Capital and the Adequate Protection Lien granted herein below.  Effective upon entry of this Order, the Trustee shall retain the Carve-Out for the benefit of the Estates, including but not limited to payment of the Expenses (defined below), payment of the Trustee's statutory commission on the Sale pursuant to 11 U.S.C. § 326, payment of the Trustee's professionals pursuant to 11 U.S.C. § 330 and 331, and for distribution in accordance with this Order and 11 U.S.C. §§ 503 and 726. If, after payment of the Processor/Agent Cure Amounts (as defined below), the balance of the Carve-Out is less than $800,000.00 (the "Backstop Amount"), within the later of 14 days' notice to Luxor Capital's counsel by the Trustee or his counsel and 30 days after the Closing of the Sale of the Payment Processing Business to Luxor Capital (or its designee), Luxor Capital will pay the difference between the Carve-Out and the Backstop Amount.

d.   The Trustee is authorized to pay the following expenses from the Cash Collateral (the "Expenses"):

    i.   The Cure Amounts related to processed transactions in March and April 2024, as well as amounts owing to agents under the Assumed Contracts for processed transactions in March and April 2024 (collectively, the "Processor/Agent Cure Amounts"), as required by the APA (*see* APA § 1.3);

    ii.   Consultant Compensation;

    iii.   All reasonable and necessary costs to maintain and preserve the Estates' assets, books, records and electronic data during the sale process, including without limitation all costs associated with insurance, utilities, maintaining the Debtors' IT systems, and rent, including additional rent, payable under the Debtors' leases for the Debtors' premises; and

    iv.   Other expenses agreed to by Luxor Capital in writing (via email is acceptable).

e.   Upon entry of the Final Order, the Trustee is authorized to pay the following additional Expenses from the Cash Collateral:

    i.   Missed pre-petition employee contributions to benefit plans and payroll taxes;

    ii.   Taxes;

    iii.   All allowed professional fees and expenses of Trustee's professionals, and all statutory commissions to which the Trustee is entitled; and

    iv.   Any other administrative expenses.

**F.  Retention of Consultants**

20.     These Bankruptcy Cases are relatively complex in comparison with typical commercial chapter 7 bankruptcy cases, and the payment processing business is highly specialized.  Section 5.1 of APA provides that, upon execution, the Trustee will permit agents of the Buyer to obtain access to the books, records and IT of the Payment Processing Business in order to preserve the value of the Acquired Assets and assist with identifying Assumed Contracts to be assumed and assigned and their respective Cure Amounts.  In addition, the Trustee has determined that it is necessary to retain certain former employees of the Debtors and certain other non-professionals as consultants (the "Consultants") to assist him in connection with the proposed Sale.  Specifically, the Trustee seeks to retain Consultants to perform the following services, as required:

  a.  Facilitate the recovery, maintenance, transfer, and archival of electronic records and data, as well as the Estates' many domain names;

  b.  Assist the Trustee and his counsel in evaluating critical needs of the Estates to maintain the status quo, including maximizing the collection of Residual Fees; and

  c.  Provide administrative, ministerial, and other services that the Trustee may require.

21.     The Trustee proposes to pay the Consultants the amount of $100 - $150 per hour or such other arrangement as the Trustee determines in his reasonable business judgment (the "Consultant Compensation").  For the avoidance of doubt, by this Motion, the Trustee is not seeking to retain any employees. Any Consultants retained by the Trustee will be independent contractors.  In addition, the Trustee seeks authority to pay necessary administrative expenses,

14

including those incurred in connection with, among other things, accounting, IT services, sale of assets, and other tasks.

## **Summary of Relief Requested**

22.     The Trustee seeks entry of the Interim Order, substantially in the form attached to this Motion: (i) approving the Cash Collateral Agreement, including the use of Cash Collateral, on an interim basis; (ii) authorizing, on an interim basis, the Trustee to retain the Consultants and to pay the Consultant Compensation without further order of Court; and (iii) scheduling the Final Hearing.

23.     The Trustee further requests that, following the Final Hearing, the Court enter the Final Order, in substantially the form attached to this Motion, (a) approving the Cash Collateral Agreement, including the use of Cash Collateral, on a final basis; (b) authorizing, on a final basis, the Trustee to retain the Consultants and to pay the Consultant Compensation without further order of Court; (c) authorizing the sale of the Payment Processing Business Assets to Buyer pursuant to the APA; (d) approving the assumption and assignment of the Assumed Contracts (defined herein); and (e) scheduling the Second Sale Hearing.

24.     Finally, after the Second Sale Hearing, the Trustee requests that the Court enter the Second Sale Order authorizing the Trustee to sell the ASAP Domain Name to Buyer or to such other higher and better bidder.

25.     In summary, the Trustee's proposed timeline is as follows:

| Hearing to consider entry of Interim Order | May 22, 2024 at 1:00 p.m. (requested) |
| Issuance of Cure Notices | *14 days prior to Sale Hearing* |
| Deadline for Counterparties to Object to assumption and assignment of Assumed Contracts | *Prior to Sale Hearing* |
| Final Hearing and Sale Hearing | June 5, 2024 at 2:00 p.m. |
| Second Sale Hearing | On or about September 4, 2024 |

## Basis for Relief

### A.    The Cash Collateral Agreement Should be Approved.

26.    Sections 105, 704(a)(1), and 363(c)(2)(A) of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 9019, provide authority for the Court to approve the Cash Collateral Agreement.

27.    Section 704(a)(1) provides that a trustee "shall collect and reduce to money the property of the estate . . . ." Section 105(a) provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." Section 363(c)(2)(A) provides that a trustee may use cash collateral if "each entity that has an interest in such cash collateral consents."

28.    Rule 9019(a) provides, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." The United States Court of Appeals for the Third Circuit has emphasized that "to minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" Myers v. Martin (In re Martin), 91 F. 3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). Before approving a settlement under Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interests of the estate." In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting Louise's, 211 B.R. at 801). To reach such a

LEGAL\70534854\1

determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement.  <u>Martin</u>, 91 F.3d at 393. Fundamental to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation."  <u>Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 425 (1968).

29.     The Trustee submits that entering into the Cash Collateral Agreement would be in the best interest of the Estates and the Debtors' creditors.  The Cash Collateral Agreement would provide the Trustee with funds to sell the Acquired Assets, pay expenses of the Estates and, if possible, make distributions to creditors.  Without these funds, the Trustee would not be able to sell the Payment Processing Business Assets, and no creditors would stand to receive any distribution from those assets.

30.     The Trustee's entering into the Cash Collateral Agreement is authorized under the Bankruptcy Code and Rules, and meets the applicable standards.  First, section 704(a) of the Bankruptcy Code provides that the Trustee shall collect and reduce to money the property of the Estates.  The Trustee's entry into the Cash Collateral Agreement allows him to collect money for the benefit of the Estates and, further, fund the Sales to bring additional money to the Estates. Accordingly, an order approving the Cash Collateral Agreement pursuant to section 105(a) should be issued as necessary and appropriate for the Trustee to carry out the provisions of the Bankruptcy Code, including the fulfillment of his duties under section 704.

31.     From the Trustee's perspective, gaining the ability to use the Cash Collateral, subject to the terms and conditions of the Cash Collateral Agreement, is critical to his ability to administer the Estates and liquidate the Debtors' assets in an expeditious and prudent manner.

LEGAL\70534854\1

32.    Next, the Cash Collateral Agreement constitutes a settlement and allowance of claim amounts and rights to the Prepetition Collateral.  The Trustee submits that the settlements embodied in the Cash Collateral Agreement meet the standards applicable under Rule 9019.  The Trustee is satisfied that the amount of the Luxor Secured Claim is a legal, valid, binding obligation of all of the Estates with the exception of Holdings, and is secured by valid, enforceable, binding, perfected and non-avoidable first-priority liens and security interests on the Cape Payments Assets.  Luxor Capital has agreed to release and waive and liens that it may have on the ASAP Assets.  The settlement of the Luxor Secured Claim and rights in the Cape Payments Assets and the ASAP Assets embodied in the Cash Collateral Agreement is far preferable to expensive and time-consuming litigation and/or a possible inability to use cash collateral.  For these reasons, the Trustee's entry into the Cash Collateral Agreement is well within the reasonable exercise of his business judgment.

33.    Finally, the Trustee notes that under the Cash Collateral Agreement, Luxor Capital explicitly consents to the Trustee's use of cash collateral, subject to the terms of the Cash Collateral Agreement.  Accordingly, the Trustee's use of cash collateral pursuant to the Cash Collateral Agreement is authorized under section 363(c)(2)(A) of the Bankruptcy Code.

**B.    The Trustee Should be Authorized to Retain and Compensate the Consultants.**

34.    Trustee seeks approval of the retention of the Consultants and the payment of Consultant Compensation pursuant to section 363(b) of the Bankruptcy Code.  Section 363(b)(1) provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Further, pursuant to section 105(a), the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

18

35.     A court should approve a trustee's sale or use of assets outside of the ordinary course of business if the trustee demonstrates a sound business justification for the proposed transaction.  See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbott's Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986).  Once the trustee articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("A presumption of reasonableness attaches to a Debtor's management decisions.").

36.     The Trustee submits that his retention and compensation of the Consultants is a sound exercise of his business judgment.  The Consultants, as former employees of the Debtors, have intimate knowledge of the Debtors' business and assets, and of the payment processing industry in general.  Considering Luxor Capital's consent, the Trustee requests that he be authorized to compensate the Consultants without the need for the Trustee to file an application for compensation with the Court.

37.     Under these circumstances, the Trustee submits that his retention and compensation of the Consultants on the terms set forth in this Motion is essential, appropriate, and in the best interests of the Estates and their creditors.

**C.     The Trustee's Need for Interim Approval and Scheduling of Final Hearing**

38.     Local Rule of Bankruptcy Practice and Procedure 4001-2(b) provides, "When Financing Motions [which include cash collateral motions] are filed with the Court on or shortly after the petition date, the Court may grant interim relief pending review by interested parties . . .

LEGAL\70534854\1

.  Such interim relief shall be only what is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

39.     By a motion to shorten and limit notice filed concurrently with this Motion, the Trustee is requesting that the Court conduct an expedited interim hearing on this Motion and approve set forth in the Interim Order on an interim basis, and, following the Final Hearing, on a final basis.  The Trustee submits that interim relief is necessary to avoid potential immediate and irreparable harm.

40.     The Trustee respectfully requests that the Court schedule the Final Hearing for a date as soon as reasonably possible following entry of the Interim Order, and fix a deadline applicable for objections, if any, to the relief requested in the Final Order.

41.     The Trustee further requests that the Court schedule the Final Hearing  for on or about June 4, 2024, as well as set a deadline to object one prior to the scheduled hearing date.

**D.     The Sale of the Payment Processing Business Assets and ASAP Domain Name Should be Approved pursuant to Section 363(b) of the Bankruptcy Code.**

42.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  Courts have held that proposed sales of property pursuant to section 363(b) should be approved upon a finding that the decision to enter into the transaction represents a reasonable business judgment.  E.g., In re Filene's Basement, LLC, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("Transactions under § 363 must be based upon the sound business judgment of the debtor or trustee."); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (Bankr. D. Del. 1991) (holding that sale outside ordinary course of business should be approved if "(1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has

20

acted in good faith."). Sales of property outside of the ordinary course of business may be by private sale. *See* Fed. R. Bankr. P. 6004(f)(1).

43.     The Trustee has a sound business justification for selling the Acquired Assets in the manner proposed herein, having tailored the proposed Sales to maximize the recovery to the Estates.  As noted above, the Trustee believes that the circumstances justify an expedited sale of the Payment Processing Business Assets to obtain value for the benefit of the Estates.  If a lengthy marketing process were to take place, the value of the Payment Processing Business Assets may diminish entirely.  In that scenario, it is unlikely that Luxor Capital would agree to the Carve-Out and payment of an additional $350,000, and the Trustee would be forced to abandon the assets with no recovery for creditors.  No other parties have signed a nondisclosure agreement or submitted a term sheet proposing to purchase the Payment Processing Business Assets.  If the Trustee receives a higher or better offer, however, the APA provides that the Trustee will conduct an auction prior to the Sale Hearing.

44.     With respect to the ASAP Domain Name, the fairness and reasonableness of the purchase price, $300,000, will be conclusively demonstrated by a 90-day exposure to the marketplace.  Luxor Capital's offer will serve as a baseline bid, which will be tested by a "market check" – the best means for establishing whether the Trustee is receiving a fair and reasonable price for the ASAP Domain Name.

45.     Accordingly, consummating the Sales expeditiously and in the manner proposed by the Trustee is in the best interest of the Estates.

**E.  The Sales Should be Made Free and Clear of Liens Pursuant to Section 363(f) of the Bankruptcy Code.**

46.     Section 363(f) of the Bankruptcy Code permits a trustee to sell assets free and clear of all claims, liens, mortgages, pledges, security interests, rights of first refusal, obligations,

and encumbrances of any kind whatsoever (collectively, the "<u>Liens</u>") (with any such Liens attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

47.     Under section 363(f), a trustee may sell all or any part of the debtor's property free and clear of any and all liens, claims, or interests in such property if: (1) such a sale is permitted under applicable non-bankruptcy law; (2) the party asserting such a lien, claim, or interest consents to such sale; (3) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (4) the interest is the subject of a bona fide dispute; or (5) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

48.     As section 363(f) is written in the disjunctive, a trustee need only meet one of the five conditions.  Here, the Trustee will be able to demonstrate at the Sale Hearing that he can satisfy one or more of these conditions with respect to each party holding a lien on or security interest in any of the Purchased Assets.  At a minimum, the Trustee expects that the second and fifth of these requirements will be satisfied.  Indeed, Luxor Capital, the Debtors' primary secured creditor, is the purchaser under the APA and thus fully consents, thereby satisfying the second requirement.

**F.  <u>Buyer Should Receive the Protections of Section 363(m) of the Bankruptcy Code.</u>**

49.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See <u>In re Mark Bell Furniture Warehouse, Inc.</u>, 992 F.2d 7, 9 (1st Cir. 1993); <u>In re Willemain v. Kivitz</u>, 764 F.2d 1019, 1023 (4th Cir. 1985); <u>In re Congoleum Corp.</u>, No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007).  In response to any objection, the Trustee will present facts

at the Sale Hearing demonstrating that Buyer has negotiated at arm's length, and that all parties were represented by their own counsel.  Accordingly, the Sale Orders include a provision that Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.

**G.  <u>The Assumption and Assignment of the Assumed Contracts Should Be Approved.</u>**

50.     Section 365(a) of the Bankruptcy Code provides that a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." The standard governing bankruptcy court approval of a trustee's decision to assume or reject an executory contract or unexpired lease is whether the trustee's reasonable business judgment supports assumption or rejection.  <u>See, e.g.</u>, <u>Sharon Steel Corp.</u>, 872 F.2d 36, 39-40 (3d Cir. 1989); <u>In re Stable Mews Assoc., Inc.</u>, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  The business judgment test "requires only that the trustee demonstrate that [assumption or] rejection of the executory contract will benefit the estate."  <u>Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)</u>, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (<u>quoting Stable Mews Assoc.</u>, 41 B.R. at 596).  Any more exacting scrutiny would hinder the administration of the estate and increase costs.  <u>See Richmond Leasing Co. v. Capital Bank N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985).

51.     In order to assign an executory contract, a trustee must first assume it.  In order to assume a contract, a trustee must "cure, or provide adequate assurance that [he] will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default (the "<u>Cure Amounts</u>").  11 U.S.C. § 365(b)(1).  Here, the Trustee proposes to mail the notice substantially in the form of <u>Exhibit F</u>, as well as a copy of the Motion, to the non-debtor counterparties (the "<u>Non-Debtor Counterparties</u>") not less than fourteen (14) days prior to the Sale Hearing.  In the Cure Notice, the Trustee will inform the Non-Debtor Counterparties that

the Assumed Contracts will be assumed and assigned to Buyer and sets forth what the Debtors' records show to be the applicable Cure Amounts, if any.

52.     Once an executory contract is assumed, the trustee may then seek to assign the contract.  Pursuant to section 365(f) of the Bankruptcy Code, a trustee may assign an assumed contract if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle Homes. Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and wherewithal to manage the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

53.     In response to any objection to Buyer's ability to perform under any executory contract and/or unexpired lease, the Trustee will present facts at the Sale Hearing demonstrating Buyer's financial wherewithal, and its willingness and ability to perform under the executory contract(s) or unexpired lease(s) in question.  The Sale Hearing, therefore, will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of Buyer to provide adequate assurance of future performance.

LEGAL\70534854\1

54.     The APA permits the Buyer to designate additional Assumed Contracts after Closing.  To the extent that Buyer identifies additional Assumed Contracts, a Cure Notice will be provided to the Non-Debtor Counterparty with 14-days' notice to object to the proposed assumption and assignment and Cure Amount.  Any Non-Debtor Counterparty to any Assumed Contract who does not file an objection within the 14-days' notice period, will be barred from objecting to the Cure Amount or asserting or claiming any Cure Amount (other than the Cure Amount listed on the Cure Notice) against the Trustee, the Estates, or the Buyer.  Moreover, any Non-Debtor Counterparty to an Assumed Contract who does not file an objection within the 14-days' notice period will be deemed to have consented to the assumption and assignment of its Assumed Contract to the Buyer and will be barred from objecting to such assumption and assignment on account of the Cure Amount, lack of adequate assurance, or any other grounds.  If any objection is resolved by the Court in a manner that is not satisfactory to the Buyer, the Buyer shall retain the right to remove the contract subject to such objection from the Cure Notice, and such contract or lease shall not constitute an Assumed Contract.

**H.   Relief from Bankruptcy Rule 6004(h) is Warranted.**

55.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Trustee requests that the Court waive this 14-day stay, and that the Sale Order be effective immediately.

56.     The purpose of Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the 14-day stay, the leading bankruptcy treatise

LEGAL\70534854\1

suggests that the fourteen day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008). The treatise further suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.

57.    As described above, time is of the essence.  The Trustee needs to move as expeditiously as possible in order to prevent a deterioration in value of the Estates' assets. Consequently, a waiver of the Bankruptcy Rule 6004(h) stay is in the Estates' best interest.

## Notice

58.    The Trustee will provide a copy of this Motion and/or notice of the Final Hearing and Sale Hearing at least 21 days' in advance of such hearings to (i) the Office of the United States Trustee; (ii) Luxor Capital; (iii) the top twenty (20) unsecured creditors listed in the Debtors' bankruptcy schedules on a consolidated basis in these Bankruptcy Cases; (iv) all parties who are scheduled in Cape Payments' bankruptcy schedules E/F; (v) all parties who have filed claims in the Bankruptcy Cases as of the date of this Motion; (vi) all creditors listed in the Schedule D in the Debtors' bankruptcy schedules; (vii) all parties listed as counterparties in Schedule G of the Debtors' bankruptcy schedules; (viii) the Internal Revenue Service, (ix) all applicable federal, state, and local taxing and regulatory authorities known by the Trustee to have jurisdiction over all or part of the Acquired Assets; (x) the United States Department of Justice and applicable state attorneys general; (xi) the United States Attorney's Office for the District of Delaware; (xii) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (xiii) all parties who have filed a proof of claim in the Bankruptcy Cases as of the date below, and (xiv)

any other parties known by the Trustee to have expressed an interest in a transaction with respect to all or part of the Acquired Assets, and/or known by the Trustee to potentially possess and/or assert an interest in all or part of the Acquired Assets (collectively, the "Notice Parties").

59.     In addition, as noted above, the Trustee will cause a copy of the Cure Notice and a copy of the Motion to be served upon the Non-Debtor Counterparties not less than 14 days prior to the Sale Hearing (or thereafter as applicable).  The Trustee submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Trustee respectfully requests that the Court grant the relief requested by this Motion, as well as any additional relief that may be appropriate.

Respectfully submitted,

Dated: May 13, 2024                              **COZEN O'CONNOR**

*/s/ Gregory F. Fischer*
Mark E. Felger (No. 3919)
Gregory F. Fischer (No. 5269)
1201 N. Market St., Ste. 1001
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013
E-mail: mfelger@cozen.com
gfischer@cozen.com

*Proposed Counsel for Jeoffrey L. Burtch, as Interim Chapter 7 Trustee*